# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>REID BENJAMIN JOHNSTON,<br><br>Appellant. | No. 56601-0-II<br><br><br><br>UNPUBLISHED OPINION |

PRICE, J. — Reid Johnston appeals the trial court's denial of his motion to suppress a stolen firearm found during the execution of a search warrant on a car for controlled substances and drug paraphernalia. After the trial court's denial of the motion, Johnston entered a guilty plea to an amended information that included the following charges: possession of a stolen firearm, trafficking in stolen property in the first degree, and possessing stolen property in the first degree—other than a firearm.

On appeal, Johnston argues that the trial court erred by denying his motion to suppress the firearm. He separately argues that his guilty plea should be withdrawn because the plea was constitutionally invalid. Johnston further argues that the trial court improperly imposed a $100 DNA (deoxyribonucleic acid) collection fee against him. Finally, Johnston submits a statement of additional grounds (SAG).[1]

---

[1] RAP 10.10.

We affirm Johnston's convictions. By pleading guilty, Johnston waived his right to appeal the suppression ruling. Johnston also fails to show that he is entitled to withdraw his guilty plea. We affirm the imposition of the $100 DNA collection fee and hold that Johnston's grounds in his SAG fail or are unreviewable.

FACTS

I. SEARCH OF JOHNSTON'S VEHICLE

On August 18, 2020, Deputy Alan Jorgensen conducted a traffic stop of a car with a defective taillight. Johnston was the owner of the vehicle and rode as the front seat passenger. The driver admitted to Deputy Jorgensen that she had a suspended license. Deputy Jorgensen confirmed the driver's license was suspended and asked her to step out of the vehicle, preparing to arrest her for driving with a suspended license. As she exited the vehicle, she turned toward Johnston and motioned. Deputy Jorgensen observed Johnston reach for an object and hide it behind the driver's seat.

Deputy Jorgensen asked Johnston what he had grabbed and asked to see it. Johnston placed a piece of cellophane on the driver's seat. Deputy Jorgensen suspected the cellophane contained drugs based on his knowledge that people use cellophane for small amounts of drugs like heroin.

The driver stated that the cellophane was from some cigarettes she had purchased. Deputy Jorgensen became wary of the situation and asked Johnston to step out of the vehicle. On returning to the vehicle, the Deputy saw a piece of burned tinfoil that he believed contained heroin on the back seat, behind the passenger seat. Deputy Jorgensen asked the driver if the suspected heroin was hers, and she admitted it was and that the cellophane also contained "a little bit of heroin." Verbatim Rep. of Proc. (VRP) at 12.

2

Deputy Jorgensen asked Johnston for consent to search his vehicle, which Johnston denied. Deputy Jorgensen took Johnston into custody and seized the car to apply for a search warrant. On the way to the jail, the driver told Deputy Jorgensen that a bag containing methamphetamine was in the car and it belonged to Johnston.

Deputy Jorgensen obtained the search warrant for Johnston's car. Pursuant to his affidavit in support of the search warrant, Jorgensen believed the car contained "[e]vidence of the crime(s) of RCW 69.50.4013 Possession of controlled substance, RCW 69.50.412 Unlawful use of Drug Paraphernalia;" and "[c]ontraband, fruits of crime, or other things otherwise criminally possessed." Suppl. Index to Clerk's Papers (CP) at 14 (Exhibit 5 at 1).

Deputy Jorgensen and Police Detective Jon Stuart executed the search warrant. Deputy Jorgensen located a bag in the center console that contained what he suspected to be methamphetamine. Detective Stuart searched the trunk of the car and observed a holstered firearm protruding from a bag. From its location inside the holster, Detective Stuart saw that the firearm's grip was originally purple but was poorly spray painted black. Detective Stuart noted that the paint job did not appear to be professionally done. Based on his training and experience, the paint job was suspicious to Detective Stuart because he knew that some people attempt to alter firearms by painting them. This caused Detective Stuart and Deputy Jorgensen to suspect that the firearm could be stolen.

Detective Stuart was familiar with Johnston's name; however, he did not know Johnston's criminal history. He asked Deputy Jorgensen if Johnston was a convicted felon. Deputy Jorgensen stated that he was not sure, but he believed he was. Deputy Jorgensen had prior contacts with

3

Johnston and was aware he had a criminal history. Neither officer, however, was aware of Johnston's specific criminal history or whether Johnston could lawfully possess a firearm.

According to Detective Stuart, he removed the firearm from the bag because of the altered paint job, the possibility that Johnston was a convicted felon, the fact that the officers would not usually leave firearms in vehicles that they released to towing companies, and the officers' desire to render the firearm safe.

Detective Stuart testified that he typically renders a firearm safe when he finds one. He observed that the specific type of firearm can "sometimes be in poor operable condition" and he needed to continue his search of the bag. VRP at 42. As the officers removed the firearm from the holster, they determined it was loaded. They cleared the firearm's chamber. After handling the firearm, the officers were able to see a serial number, which they used to determine that it was stolen.

Detective Jorgensen then sought an amended warrant for the stolen firearm. The amended warrant added authority to search for "weapons or other things by means of which a crime has been committed." Suppl. Index to CP at 25 (Exhibit 6 at 4).

II. CHARGES AGAINST JOHNSTON

On August 19, 2020, the State charged Johnston with possession of a stolen firearm, possession of a controlled substance—heroin, and possession of a controlled substance—methamphetamine. In April 2021, the heroin and methamphetamine counts were removed after

4

the drug possession statute, RCW 69.50.4013, was voided by our Supreme Court's decision in *State v. Blake*, 197 Wn.2d 170, 195, 481 P.3d 521 (2021).[2]

In December 2020, while the case was pending, the State charged Johnston under a separate cause number with theft in the first degree and trafficking in stolen property in the first degree for acts that occurred on or about December 13, 2020. Specific to the crime of trafficking in stolen property, the information stated that Johnston "*did knowingly* initiate, organize, plan, finance, direct, manage, or supervise the theft of property, to-wit: figured maple tree, for sale to others, or *did knowingly* traffic in stolen property." CP at 160 (emphasis added) (boldface omitted).

In May 2021, while the two cases were pending, the State charged Johnston under a third cause number with possession of stolen property in the first degree for acts that occurred on or about April 12, 2021. The information stated that Johnston "did *knowingl*y receive, retain, possess, conceal, or dispose of stolen property, other than a firearm . . . , to-wit: a 2019 John Deere Excavator belonging to Thomas Johnson, owner of Nordland Construction, of a value in excess of $5,000, *knowing* that it had been stolen." CP at 162 (emphasis added) (boldface omitted).

III. CrR 3.6 SUPPRESSION HEARING

Prior to trial, Johnston moved to suppress all evidence found as a result of the August 2020 vehicle search. In August 2021, the trial court held a CrR 3.6 suppression hearing. Deputy Jorgensen and Detective Stuart testified to the facts above concerning the search.

At the suppression hearing, Johnston argued that after *Blake*, the simple drug possession could not provide probable cause for a search of his vehicle. Johnston further argued that the drug

---

[2] *Blake* was decided after the search of Johnston's vehicle.

paraphernalia statute, RCW 69.50.412(1), should also be held void under *Blake*. And Johnston contended that the plain view doctrine did not apply to the firearm found in the trunk because the officers did not have immediate knowledge that the firearm was evidence of a crime.[3] Thus, Johnston argued, the officers lacked probable cause to remove the firearm from the holster and run the serial number.

The trial court denied the motion to suppress evidence of the firearm.[4] The court ruled that Deputy Jorgensen conducted a valid *Terry*[5] stop of Johnston's car and "had probable cause to search for the use of drug paraphernalia, which involves both paraphernalia and substances. And . . . he also had probable cause at the time because . . . he had information that there was heroin and methamphetamine in the car." VRP at 74-75.

The trial court also determined that the evidence of the firearm was properly obtained under the plain view doctrine. The court reasoned that the firearm was suspicious to the officers because of its paint job, it was loaded, and it was in the possession of someone they thought could be a convicted felon. And the officers properly removed it from the holster in order to determine if it was loaded and to unload it for safekeeping. On these bases, the court held that the officers were justified in reading and running the serial number.

---

[3] "The plain view doctrine applies 'when the police (1) have a valid justification to be in an otherwise protected area and (2) are immediately able to realize the evidence they see is associated with criminal activity.' " *State v. Morgan*, 193 Wn.2d 365, 370, 440 P.3d 136 (2019) (quoting *State v. Hatchie*, 161 Wn.2d 390, 395, 166 P.3d 698 (2007)).

[4] The trial court did not appear to enter written findings of fact and conclusions of law on the CrR 3.6 hearing.

[5] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

IV. GUILTY PLEA

On September 24, 2021, the State informed the trial court that it was consolidating Johnston's three cause numbers. The amended information listed the charges as possession of a stolen firearm (Count I), trafficking in stolen property in the first degree (Count II), and possessing stolen property in the first degree—other than a firearm (Count III). Like the original charging documents, the amended information expressly stated that Johnston had acted with knowledge that the property in each count was stolen.

That same day, Johnston signed a plea form admitting to the charges contained in the amended information. The plea form stated that Johnston entered the plea "freely and voluntarily" and that he read the entire plea form and understood it in full. CP at 41. The form also stated that Johnston gave up his "right to appeal a finding of guilt after a trial" and that he understood that his "right to appeal is limited." CP at 33.

Johnston's own statement specific to his crimes stated,

> On April 21, 2021 I possessed stolen property valued at more than $5000. On Dec. 13, 2020 I sold stolen property. On Aug. 18, 2020 I possessed a stolen firearm I knew was stolen. All acts in Jefferson County, WA.

CP at 41. Only Johnston's statement about Count I, possession of a stolen firearm, repeated the knowledge element found in the amended information.

In exchange for Johnston's plea, the State agreed to (1) recommend that the trial court dismiss a remaining charge of theft in the first degree, (2) not file an unlawful possession of a firearm in the second degree charge, and (3) request the imposition of a residential drug offender sentencing alternative rather than a prison sentence. The plea form also informed Johnston that the State planned to seek restitution on charged and uncharged counts.

During the plea hearing, the trial court conducted a colloquy with Johnston and his attorney. Johnston's attorney stated that he "did go over the Statement of Defendant on Plea of Guilty with [Johnston]. I believe he understands the terms of the plea agreement and the constitutional rights that he's giving up and he's willingly and voluntarily doing so." VRP at 80-81. Johnston told the trial court that what his attorney stated regarding the plea was true and confirmed that he had read the plea form. Johnston also stated that his attorney was able to answer all his questions and he believed he understood the rights that he gave up by pleading guilty. Johnston was not immediately sentenced.

Several weeks later, on November 5, Johnston's attorney explained that Johnston had expressed "a possible concern regarding the voluntariness of the plea" and that another attorney should be appointed for "a second opinion about whether he ha[d] grounds to move to withdraw the plea*."* VRP at 92. Thereafter, Johnston's attorney withdrew and another attorney was appointed.

## V. MOTION TO WITHDRAW GUILTY PLEA AND SENTENCING

On December 3, Johnston moved to withdraw his guilty plea pursuant to CrR 4.2(f). Johnston argued that his previous counsel provided ineffective assistance, specifically alleging that his counsel failed to advise Johnston of the consequences of the guilty plea and denied Johnston access to discovery that would have permitted him to make an informed decision regarding the plea. Regarding the failure to advise, Johnston declared that he was "not fully informed of all the terms of the plea bargain I was pressured into. For instance, I was never informed about any restitution owed or who the 'victims' are." CP at 52.

Johnston clarified, however, that he was *only* seeking to withdraw his guilty plea as to Count III. Johnston's counsel stated that the basis for the motion was the amount of restitution sought and Johnston's belief that his plea as to Count III was not voluntary and therefore constituted a manifest injustice. In support of the motion, Johnston's counsel argued that the amount of restitution sought, $8,000, was never discussed and, once Johnston learned of the amount, he decided to withdraw his guilty plea. Counsel pointed out that although the plea form stated that restitution would be sought, no amount was given.

Following arguments, the trial court determined Johnston's plea was voluntary, knowing, and intelligent, recounting its extensive colloquy with Johnston during the plea hearing. The trial court further observed that Johnston's desire to withdraw his plea deal as to only Count III undermined his claim that he was not fully informed as it seemed to be an admission that he was fully informed as to the first two counts. Johnston's motion was denied.

At Johnston's sentencing hearing on January 7, 2022, the prosecuting attorney requested imposition of a $100 DNA collection fee but also suggested that maybe the trial court could "hold off on that one." VRP at 114. The prosecuting attorney stated that he knew Johnston had prior felony convictions, but he had not confirmed "to see if that prior DNA sample shows up on his NCIC."[6] VRP at 114.

That same day, the trial court sentenced Johnston. The judgment and sentence, signed by Johnston, noted that Johnston had no criminal history and imposed an offender score of two. The judgment and sentence also included the $100 DNA collection fee. Two days after entry of the

---

[6] NCIC is an abbreviation for the National Crime Information Center.

judgment and sentence, Johnston filed this notice of appeal "of the denial of Motion to Withdraw Guilty Plea." CP at 76. Johnston attached the felony judgment and sentence to his notice of appeal.

ANALYSIS

Johnston makes three arguments in this appeal. First, Johnston argues that the trial court erred when it denied his motion to suppress the evidence from the search of the vehicle, specifically the firearm. Second, Johnston argues that he should be entitled to withdraw his guilty plea because his plea was not knowing, intelligent, and voluntary. Third, Johnston argues the trial court erred by imposing the $100 DNA collection fee. We reject all three arguments.

I. GUILTY PLEA WAIVED RIGHT TO CHALLENGE SUPPRESSION DECISION

Johnston challenges the trial court's order denying suppression of the stolen firearm discovered in the trunk of his car. Johnston argues that the search warrant relied on probable cause for a crime that was void under *Blake* and a void crime could not supply the required "authority of law" to search his vehicle. Br. of Appellant at 15. He also argues the warrant was not severable as to the alleged unlawful possession of a controlled substance and unlawful possession of paraphernalia. He further contends that the officers lacked probable cause under the plain view doctrine to believe the firearm was evidence of a crime and, therefore, the officers unlawfully removed the firearm from its holster.

The State argues that Johnston waived any challenge to the suppression ruling because he pleaded guilty. We agree with the State.

10

A. LEGAL PRINCIPLES

Once a guilty plea is entered, there are limitations on the issues a defendant is entitled to appeal. *State v. Cross*, 156 Wn.2d 580, 621, 132 P.3d 80 (2006), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). Generally, a defendant may appeal from that guilty plea only on issues related to the "validity of the statute, sufficiency of the information, jurisdiction of the court, or circumstances surrounding the plea." *Id*.; *see also State v. Olson*, 73 Wn. App. 348, 353, 869 P.2d 110 (1994), *review denied*, 124 Wn.2d 1029 (1994), ("If, indeed, [the defendant] did enter a guilty plea, then he would not be entitled to appeal the denial of any pretrial motions. A guilty plea generally waives the right to appeal."). Similarly, we have stated that " '[a] guilty plea waives or renders irrelevant all constitutional violations that occurred before the guilty plea, except those related to the circumstances of the plea or to the government's legal power to prosecute regardless of factual guilt.' " *State v. Brandenburg*, 153 Wn. App. 944, 948, 223 P.3d 1259 (2009) (alteration in original) (internal quotation marks omitted) (quoting *State v. Amos*, 147 Wn. App. 217, 225-26, 195 P.3d 564 (2008)), *review denied*, 170 Wn.2d 1009 (2010).

But there have been exceptions to these general principles based on the specifics of the plea. For example, in *State v. Smith*, 134 Wn.2d 849, 851-52, 953 P.2d 810 (1998), the defendant, Smith, stated that he read, understood, and signed the plea statement. Smith's counsel, however, stated in open court that Smith was *not* waiving the right to appeal the trial court's suppression ruling. *Id*. at 853. Opposing counsel and the trial court failed to correct this interpretation. *Id*. Our Supreme Court stated that ordinarily, the defendant's representation that he read and understood the plea agreement "would provide sufficient evidence of a voluntary plea and a valid waiver of the right to appeal." *Id*. But under those specific circumstances, the Supreme Court

stated that it was not clear if Smith had "knowingly, voluntarily, and intelligently relinquished the right to appeal the suppression ruling." *Id.* The Supreme Court permitted Smith to withdraw his plea. *Id.*

### B. APPLICATION

Here, Johnston stated in open court that he had read the plea statement form and believed he understood his rights and the rights he gave up by pleading guilty. In the plea form, Johnston acknowledged that, as a consequence of signing the form, his right to an appeal was limited, and he answered a series of questions during the trial court's colloquy that affirmed he understood the plea form and had discussed it with his counsel. Unlike *Smith*, nothing was said that cast doubt about whether an ability to appeal the suppression hearing was preserved, notwithstanding the plea. Nothing in the record supports that Johnston failed to understand the effect of a guilty plea on his right to appeal the suppression ruling.

Nonetheless, Johnston contends he can still appeal the suppression ruling for two reasons. First, he argues the express waivers in the plea form itself are either ambiguous or do not apply. Johnston suggests that the plea form only said his appeal rights were "limited," without explaining the actual limitations. Reply Br. at 5. And although the form stated he waived his right to appeal "after a trial," a plea is not a trial. Reply Br. at 5-6. Johnston asserts these issues should be construed in favor of his right to appeal.

Second, he argues that even under the restrictions discussed in *Cross*, a suppression hearing is part of the circumstances surrounding the plea and, therefore, the results of the hearing remain available for appeal. 156 Wn.2d at 621.

Neither argument is persuasive. To support his first argument that the plea form waivers should be construed in favor of his right to appeal the suppression decision, Johnston cites *State v. Bisson*, 156 Wn.2d 507, 521-23, 130 P.3d 820 (2006). There, the plea agreement stated that five 24-month enhancements would be included in the defendant's sentence. *Id*. at 521. The defendant, however, was never advised the enhancements would run consecutively and nothing in the record refuted this expectation. *Id*. In fact, the record included an erroneous citation indicating the enhancements would run concurrently, the weapon enhancement scoring sheet never clarified that the enhancements would run consecutively, and the trial court initially interpreted the plea agreement and attached documents as permitting the weapon enhancements to run concurrently. *Id*. Thus, on review, our Supreme Court accepted the State's concession that the plea was involuntary because Bisson was never clearly informed that the enhancements would be served consecutively. *Id*. at 525-26.

But there are no similar ambiguities or inaccuracies involved in this case. At no point was the appealability of the suppression decision raised in the context of the plea. And, unlike *Bisson*, no misrepresentations or errors were included in either the plea form or the trial court's colloquy. The asserted ambiguities identified by Johnston are simply too attenuated to the suppression decision to overcome the waiver of pre-plea issues that generally results from a guilty plea.

For his second argument, Johnston claims that, based on our Supreme Court's decision in *Cross*, "a pretrial suppression ruling can be challenged on appeal following a guilty plea" because it is part of the circumstances surrounding the plea. Reply Br. at 10-11. In *Cross,* the defendant

challenged admission of statements he made to an officer after he was read his *Miranda*[7] rights. 156 Wn.2d at 619. The trial court ruled all the statements admissible before Cross entered an *Alford*[8] plea, and several of the statements were used in the sentencing phase. *Id*. On appeal, the Supreme Court stated:

> *Broadly construed, Cross is challenging the circumstances surrounding his plea.* However, given that he does not seek to withdraw his plea, any defect in the circumstances would have to be striking to be cognizable.

*Id*. at 621 (emphasis added).

Johnston argues that this language from *Cross* should be seen as our Supreme Court's endorsement of the rule that pretrial suppression rulings should be appealable after a guilty plea. Johnston specifically asks us to hold that a pretrial suppression ruling can be challenged following a guilty plea when the denial of the motion arguably led to the defendant's plea. He explains that the suppression hearing was related to the circumstances surrounding the plea because, but for the admissibility of the firearm, he would not have pleaded guilty.

Johnston reads too much into *Cross*. "Broadly construed," nearly all pretrial decisions of consequence would be related to the circumstances that might motivate the maneuverings of the parties prior to trial, such as whether to make or accept an offer, add or dismiss charges, or to proceed to trial. *See Id*. The finality traditionally inherent in a guilty plea would be drastically eroded by such an interpretation. Here, the pretrial suppression ruling was simply too attenuated to the plea to be properly considered part of the circumstances surrounding the plea.

---

[7] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[8] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

We hold that when Johnston pleaded guilty, he waived his right to appeal the suppression ruling entered below.

II.  VALIDITY OF GUILTY PLEA

Separate from his request to directly challenge the suppression decision, Johnston argues that his guilty plea was invalid and should be withdrawn.  Johnston contends that his guilty plea as to Counts II and III was not entered knowingly, intelligently, and voluntarily because the record "fails to affirmatively show" that Johnston understood the relationship between his conduct and the elements of the crimes charged.  Br. of Appellant at 58.  Johnston argues that "the record does not demonstrate Mr. Johnston understood he needed to know the property was stolen in order to be guilty of both trafficking in stolen property (Count [II]) and possession of stolen property (Count [III])."  Br. of Appellant at 58; *see also* RCW 9A.82.050(1); RCW 9A.56.150(1).  We disagree.[9]

A.  LEGAL PRINCIPLES

" 'Whether a plea is knowingly, intelligently, and voluntarily made is determined from a totality of the circumstances.' "  *State v. Snider*, 199 Wn.2d 435, 444, 508 P.3d 1014 (2022) (quoting *State v. Branch*, 129 Wn.2d 635, 642, 919 P.2d 1228 (1996)).

" '[A] plea does not qualify as intelligent unless a criminal defendant first receives real notice of the true nature of the charge against him, the first and most universally recognized

---

[9] The State suggests that Johnston should not be permitted to challenge whether his plea was knowing, intelligent, and voluntary as to Count II, arguing that his appeal should be limited to only those arguments made below, specifically withdrawing his plea only as to Count III.  Nonetheless, because Johnston broadly challenges the validity of his plea on the general basis that it was not entered intelligently and voluntarily, we do not limit our consideration as urged by the State.

requirement of due process.' " *Id*. at 444 (alteration in original) (internal quotation marks omitted) (quoting *Bousley v. United States*, 523 U.S. 614, 618, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998)). In order to receive this notice, the defendant must " 'be aware of the basic elements of the offense charged.' " *Id*. (quoting *State v. Chervenell*, 99 Wn.2d 309, 318, 662 P.2d 836 (1983)). This requires an " 'aware[ness] of the acts and the requisite state of mind in which they must be performed to constitute a crime.' " *Id*. at 444-45 (internal quotation marks omitted) (quoting *In re Pers. Restraint of Mendoza Montoya*, 109 Wn.2d 270, 278, 744 P.2d 340 (1987)).

"When a defendant pleads guilty after receiving a charging document that accurately describes the elements of the offense charged, their plea is presumed to be knowing, voluntary, and intelligent." *Id*. at 445. "That presumption can be overcome by subsequent misinformation from the trial court about the elements of the charged crime." *Id*.

When a defendant moves to withdraw their plea before sentencing, CrR 4.2 applies. *See State v. Lamb*, 175 Wn.2d 121, 128, 285 P.3d 27 (2012); CrR 4.2 ("If the motion for withdrawal is made after judgment, it shall be governed by CrR 7.8."). Pursuant to CrR 4.2(d), a trial court "shall not accept a plea of guilty, without first determining that it is made voluntarily, competently and with an understanding of the nature of the charge and the consequences of the plea." Further, a trial court must permit "a defendant to withdraw the defendant's plea of guilty whenever it appears that the withdrawal is necessary to correct a manifest injustice." CrR 4.2(f).

A manifest injustice is one that is " 'obvious, directly observable, overt, [and] not obscure.' " *Branch*, 129 Wn.2d at 641 (internal quotation marks omitted) (quoting *State v. Saas*, 118 Wn.2d 37, 42, 820 P.2d 505 (1991)). A manifest injustice is shown when the defendant is (1) denied effective assistance of counsel, (2) the defendant or his agent did not ratify the plea,

16

(3) the plea was not voluntary, or (4) the State failed to keep the plea agreement. *State v. Wakefield*, 130 Wn.2d 464, 472, 925 P.2d 183 (1996).

We review the denial of a motion to withdraw a plea under CrR 4.2 for an abuse of discretion. *State v. Moon*, 108 Wn. App. 59, 61, 29 P.3d 734 (2001). However, when the request for withdrawal of a plea is based on a claimed constitutional error, such as when the plea is alleged to be involuntary, our review is de novo. *State v. Buckman*, 190 Wn.2d 51, 57-58, 409 P.3d 193 (2018). Here, based on Johnston's arguments, we apply a de novo review.

B. APPLICATION

Johnston argues that the omission of the knowledge element for Counts II and III from the plea form and the failure of the trial court to specifically inquire about all elements of the counts means he may withdraw his plea. For this, Johnston principally relies on three cases: *State v. S.M.*, 100 Wn. App. 401, 996 P.2d 1111 (2000); *State v. A.N.J.*, 168 Wn.2d 91, 225 P.3d 956 (2010); and *Snider*, 199 Wn.2d 435.

In *S.M.*, the State charged S.M., age 12, with three counts of rape of a child in the first degree, alleging that S.M. had "sexual intercourse" with his brother. 100 Wn. App. at 403. S.M. entered a plea agreement stating that he had "sexual contact" with his brother. *Id*. S.M. met with appointed counsel for only a brief period before the court hearing for entry of his guilty plea. *Id*. In open court, the trial court asked S.M. if he knew the meaning of "sexual intercourse" to which S.M. responded affirmatively. *Id*. at 404. This court held that S.M.'s plea statement did not show his understanding of the term "sexual intercourse," and the trial court's inquiry into whether he understood the meaning of the term, to which S.M. responded, "yes," also failed to show that S.M. understood the charges against him. *Id*. at 414-15.

In *A.N.J.*, another case with a juvenile defendant charged with a sex offense, our Supreme Court held that A.N.J. could withdraw his guilty plea because the record failed to show that he understood that "mere contact with another was insufficient to constitute the crime" rather, the contact had to occur for the purpose of sexual gratification. 168 Wn.2d at 96, 119-120. As in *S.M.*, the defendant in *A.N.J.* had limited contact with his attorney before entering his plea. *Id.* at 120.

Johnston contrasts *S.M.* and *A.N.J.* with *Snider*, in which our Supreme Court held that the record established that the defendant understood the elements of the crime charged against him and the nature of that crime. *Snider*, 199 Wn.2d at 450. In *Snider*, the defendant, Snider, was charged with the crime of failure to register, and the plea statement initially omitted the element of "knowingly." *Id.* at 442-43. However, Snider later added this element in his own handwriting and the trial court read out loud this amended plea statement during the plea colloquy. *Id.* at 443. The trial court also engaged Snider in a colloquy to confirm that he understood the charge against him. *Id.* at 450.

Although Johnston acknowledges the factual differences in these cases, he combines their holdings to contend that because the trial court only asked general questions, and his plea agreement failed to set forth the knowledge requirements of Counts II and III with no corrective notations (like in *Snider*), the record is insufficient to show that he understood all of the elements of those counts.

Johnston's argument is unpersuasive. The totality of the circumstances establish that Johnston understood that he was required to act knowingly with regard to Counts II and III. As acknowledged by Johnston, the amended information accurately conveyed the knowledge element

18

for these counts. The original charging documents also accurately conveyed the required elements. And Johnston stated in his plea agreement that he was pleading guilty to the charges as stated in the amended information and acknowledged that he "received a copy of that Information." CP at 41. Johnston also acknowledged that he fully discussed the plea agreement with his counsel, understood it, and had no further questions.

Although Johnston's personal statement of guilt omitted the knowledge element for Counts II and III, Johnston pleaded guilty to the charges as stated in the amended information, acknowledged receiving the information, and acknowledged signing the plea agreement freely and voluntary; the totality of the circumstances show that Johnston was aware of the elements of his charged crime.[10] We reject Johnston's request to withdraw his plea.

III. IMPOSITION OF $100 DNA COLLECTION FEE

Johnston argues that the trial court erroneously imposed a $100 DNA collection fee because the record is silent as to whether Johnston's DNA has previously been collected. Johnston argues that the State bears the burden of showing that a defendant's DNA has not previously been collected and, if unable, the DNA collection fee must be struck.

When an individual is convicted of a felony, a DNA collection fee must be imposed, unless the DNA has been previously collected as a result of a prior conviction. RCW 43.43.754, RCW 43.43.7541. "[W]hen a defendant has a prior Washington felony conviction, the State must show

---

[10] The factual differences of *S.M.* and *A.N.J.* are too substantial to compel a different result here. In both cases, the defendants were juveniles who had only limited contact with counsel to discuss legal concepts that were not reliably within their knowledge. *S.M.*, 100 Wn. App. 401; *A.N.J.*, 168 Wn.2d 91. Here, Johnston was an adult who met with counsel and had the charging documents that accurately stated the relatively straightforward elements of his crimes.

that the defendant's DNA has not previously been collected." *State v. Houck*, 9 Wn. App. 2d 636, 651-52 n.4, 446 P.3d 646 (2019), *review denied*, 194 Wn.2d 1024 (2020).

At Johnston's sentencing hearing, the State informed the court that it was asking it to impose the $100 DNA collection fee, but commented, "[W]e can hold off on that one, maybe, Your Honor. I know he has prior felony convictions. I did not double-check yet to see if that prior DNA sample shows up on his NCIC." VRP at 114. However, no other comments about Johnston's criminal history were made, and the felony judgment and sentence stated that no other criminal history was noted. In the end, the trial court imposed the $100 "DNA collection fee (Mandatory)." CP at 66.

The record contains no indication that Johnston had a previous felony conviction in Washington.[11] Johnston, himself, does not claim he has a prior Washington felony conviction.[12] Because there is no evidence of a previous Washington conviction, we affirm the trial court's imposition of the DNA collection fee.

---

[11] Although the State never returned to the topic of Johnston's criminal history before the trial court, Johnston signed off on the judgment and sentence that stated that he had no other criminal history and imposed an offender score of two with three current convictions.

[12] The only suggestion of a prior conviction is found in Johnston's SAG. There, Johnston states that his last conviction was 11 years ago and was for a "non-violent, non-drug class c conviction 'damage to gov[ernment] property' in Federal Court." SAG at 6.

IV.  SAG

Johnston raises three additional grounds for relief in his SAG.  He contends that he received ineffective assistance of counsel, he was forced to sign the plea agreement, and the record contains inaccuracies.  We hold each of these grounds fails or is unreviewable.

A.  INEFFECTIVE ASSISTANCE OF COUNSEL

Johnston first contends that his attorney, who represented him at both the suppression hearing and his guilty plea hearing provided ineffective assistance of counsel that undermined the validity of his guilty plea.

In order to prevail on an ineffective assistance of counsel claim, the defendant must show that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the defense.  *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011).  An ineffective assistance of counsel claim fails if the defendant fails to satisfy either prong.  *Id*. at 33.

Before the trial court, Johnston moved to withdraw his guilty plea as to Count III on the basis that "his previous counsel was ineffective in failing to advise defendant of the consequences of his guilty plea and denying access to evidence to make an informed decision regarding his plea." CP at 51.  He claimed that his attorney's performance was deficient and resulted in actual prejudice.  In support, Johnston submitted a declaration stating that he had repeatedly requested a copy of the discovery in his case but "[he] was never provided with a copy or given an opportunity to review discovery and therefore had no opportunity to refute the validity of any charges and/or evidence against [him]."  CP at 52.

In his SAG, Johnston again contends that his counsel failed to provide him full discovery under each cause number when Johnston requested it.  He claims he was not provided full

21

discovery until after he signed the plea agreement. At that point, he "still wanted to withdraw [his] plea." SAG at 3.

Here, even assuming deficient performance based on this discovery issue, Johnston cannot show prejudice. It is unclear how the discovery documents would have assisted him in refuting the charges against him or how the outcome of his case would have differed. In fact, Johnston indicates that when he was provided the discovery, he still maintained his desire to withdraw his guilty plea. Because there is no showing that the failure to provide the sought-after discovery resulted in prejudice, Johnston's ground fails.

Next, Johnston alleges that he was provided ineffective assistance of counsel because his attorney had a conflict of interest. Specifically, Johnston asserts that his previous attorney had a "relationship with a former Judge of Kitsap County and the actual owner of the stolen firearm in case 1." SAG at 1.[13]

"[T]he right to effective assistance of counsel includes the right to conflict-free counsel." *In re Pers. Restraint of Gomez*, 180 Wn.2d 337, 348, 325 P.3d 142 (2014). "To show a violation of [that] right, a defendant must show that (a) defense counsel 'actively represented conflicting interests' and (b) the 'actual conflict of interest adversely affected' [counsel's] performance." *Id.* at 348-49 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)).

Here, not only does Johnston fail to explain the type of relationship his counsel may have had with these other persons, there is no evidence of any alleged relationships within the record. *See State v. McFarland*, 127 Wn.2d 322, 338 n.5, 899 P.2d 1251 (1995) (a reviewing court does

---

[13] Defendant hand-numbered his SAG and labeled the first two pages as page 1. This quote comes from the second page 1.

not review alleged errors that are outside the record on direct appeal). Therefore, we do not consider Johnston's ineffective assistance of counsel claim based on a conflict of interest.

B. FORCED TO SIGN PLEA AGREEMENT

Johnston next contends that he was forced to sign the plea agreement.

As explained above, we look to the totality of the circumstances when determining if a plea agreement is voluntary. *Snider*, 199 Wn.2d at 444. "A guilty plea is involuntary and invalid if it is obtained by mental coercion overbearing the will of the defendant." *State v. Williams*, 117 Wn. App. 390, 398, 71 P.3d 686 (2003), *review denied*, 151 Wn.2d 1011 (2004).

Johnston claims his counsel informed him that he had 30 minutes to accept the plea agreement, and he also asserts that he had no money to employ additional counsel, suggesting that this also caused him to enter the plea. Before the trial court, when he moved to withdraw his guilty plea as to Count III, Johnston made similar arguments, declaring that he felt rushed to enter the plea agreement and he did not have additional money that would permit him to continue litigating the charges against him.

But, as noted above, Johnston signed the plea agreement, which stated that he was signing it freely and voluntarily. The trial court asked Johnston a series of questions, including whether he was forced to sign the plea agreement, stating: "Other than the plea offer that's being made here, is anybody making threats or promises to you or forcing you or coercing you to plead guilty?" VRP at 85. Johnston responded that he was not forced or coerced. The record shows that Johnston had the opportunity to state that he felt forced into taking the plea, but he failed to do so. Nothing else in the record plausibly relates to facts about Johnston being forced to sign the plea agreement. This ground fails.

C. Facts Underlying Charges

Finally, Johnston alleges that errors in the record violated his rights. Specifically, Johnston alleges that (1) errors exist in the police report, (2) an officer's statement did not match the police report, (3) Johnston had his registration and insurance at the time that Deputy Jorgensen stopped the driver of the vehicle; however, the deputy did not accept or look at them, (4) Deputy Jorgensen failed to inform Johnston of the reason for his arrest, and (5) Deputy Jorgensen acted as if he knew Johnston, however, Johnston has had no recent felony convictions.

All of these claimed errors rely on facts that are not contained in our record. Therefore, we cannot review them. *McFarland*, 127 Wn.2d at 338 n.5; *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008) (issues that rely on facts outside of the record should be raised in a personal restraint petition, not a SAG).

## CONCLUSION

Johnston's guilty plea was entered knowingly, intelligently, and voluntarily. Accordingly, he waived his ability to appeal the pre-plea suppression ruling and may not withdraw his plea. Further, the trial court did not err by imposing the $100 DNA collection fee, and the grounds raised in Johnston's SAG either fail or are unreviewable.

We affirm.

No. 56601-0-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
PRICE, J.

We concur:

_____
LEE, P.J.

_____
CHE, J.